## SIMON HANDLEY *versus* MOSES CALL.

On the trial of a special action on the case against the defendant, for a conspiracy between him and a deputy sheriff to defraud the plaintiff, by means of making a false return upon a writ in the defendant's favor, one who was injured equally with the plaintiff by the fraud, if it existed, is a competent witness.

But on such trial, evidence that the defendant had applied to another deputy, to do a similar act in a different suit, is inadmissible.

A motion for a new trial, because the verdict was against the evidence, is grantable in some measure at discretion ; and when the Court, upon an examination of the case, is satisfied, that injustice has not been done by the verdict, a new trial should not, ordinarily, be granted.

The admission of illegal evidence does not, in every case of this character, entitle the party against whom it was admitted, and against whom the verdict was rendered, to a new trial. But if it be reasonable to believe, that the jury could have been unduly influenced by the wrongfully admitted testimony, or if it be doubtful whether they would otherwise have determined as they have done, a new trial should be granted.

THE following is a copy of the case, on the exceptions and motion for new trial, because the verdict was against the evidence.

" This was an action on the case charging defendant with conspiring with one Joel How, Jr. a deputy sheriff, and procuring said How to make a false return of an attachment of certain real estate. The writ was dated July 5, 1845.

" Plaintiff called certain witnesses who testified as follows : —

" *Joel How, Jr.* I was deputy sheriff in March, 1841. Moses Call showed me a writ — I signed the returns he asked me to. I did not look at it — It was on the 6th of March — He gave me the writ next morning after the 6th. I told him it looked too bad. He took it back and made two, and told me I had a right to sign them. — After he had destroyed that in the fire, he made two writs, wanted me to make the returns in my handwriting. This was on the 7th — dates were 3d and 4th. ( *Quest. by the Court.* ) I wrote the returns at the request of Dr. Call. I or my father brought the returns to the Register's within 4 days after. There were 3 days between the making the returns and the record. I put the returns into the mail —

did'nt have the writs after that. I put the returns into the mail in 4 days after the 7th. I put them into the postoffice in time — don't know whether they got here or no.

"I went to Harrington's corner on the 5th. That is the way I fix the date. Call told me if any body asked me any questions to say nothing about it. If 'twas settled, he'd pay me and keep it dark — said if there was any trouble Burgess would be next sheriff and he should have the appointment for the Mills and the Bridge. — I told him people suspected wrong had been done — hinted something about money, I told him I did not want it — said Green would go out and Burgess come in — that he would stick to me as long as he had a dollar. This was within the 5 days. — I did see the return, the first one, when I signed it — Call said I could date the two writs same as the first. — This was the first business I did as deputy sheriff. — Don't know that Handly paid any thing to relieve the attachment.

"*Cross Examined.* — *Quest.* How do you know the date of the writs? *Ans.* I put them on my docket — do'nt learn the date from my docket — I dated returns — I did'nt keep docket at that time — I know they were dated 3d and 4th, because it gave me trouble. — It is matter of recollection as to dates. — Have no particular thing to go by. — There was the Harrington affair. — 5th of March. — Was at Harrington's. — Attached some goods in store for Myrick — between sun down and 12 at night. I did'nt make the return on Call's writ, I only saw the outside. — It was on the 6th I signed it. — It was the 7th that I had it. — Harrington came down on the 6th and said he did'nt believe I had a writ — that he believed it was a fraudulent transaction. *Quest.* What did he say was a fraudulent transaction? *Ans.* Dating the writs on the 3d and 4th. This talk was the next day after I was at Harrington's corner on the 5th. Harrington said it was fraudulent because dated on the 3d and 4th. I did not say much to him — I had 'nt the writs then — I had not told any one I had a writ against Harrington in favor of Call. I know it was the 7th I

signed the writs because it was about the time they were going
on record.

"I married plaintiff's neice about two years since — I first told
Handley of this in the fall of 1845, never told any one before
— think I had some conversation with one or two others.
*Quest.* Have you a bond of indemnity from Handly? *Ans.*
Handley and I never had any conversation about bond — do'nt
know that I ever said any one was a fool for saying any thing
about bond — might and might not. *Quest.* Have you not
reason to believe that there is a bond of indemnity to protect
you in this matter? *Ans.* I should guess it was as likely there
was as was not. There is no bond in my possession. I did
make affidavit of this. I talked some with Hussey — it was
he who took down my statement in writing in 1845 — what I
would swear to — I think it likely he took it down — I believe
he did — I did'nt tell the whole — did'nt mean to at the time.

"*Quest.* Did you not know it was wrong to make a false re-
turn? *Ans.* I did'nt know it was wrong when I signed the
first return. *Quest.* When did you find it out? *Ans.* I found
it out a day or day and a half afterwards. — I have seen copies
of the returns from the Registry — have not ascertained the
dates from them — I knew them before — shown me at first
trial — think I was shown copies at Wiscasset by either Hussey
or Abbot. — I think I saw Harrington every day from the 5th
to the 9th — he did not say any thing about this to me but once
and this was on the 6th March. — He then said he thought
there were notes bought by Call, and put after the writs were
made and put in them after the conveyance of his property to
Myrick and others. — Don't know how many notes were in the
first writ — did'nt see the inside, only the outside. He made
the two writs on the 7th instead of the one first made. *Quest.*
Why did he make two writs instead of one? I told him the
first writ looked too bad. *Quest.* Did that make it necessary
to make two instead of one? *Ans.* He could'nt get all the
notes into one, plain. *Quest.* What made the first writ look
bad? *Ans.* It was interlined. *Quest.* How was it interlined?
*Ans.* By putting in more notes — that is what I call inter-

lining. *Quest.* How many notes were in the first writ ? *Ans.* I can't tell — did not see the inside — I did'nt make or sign any return till after I went to Harrington's corner. I told him (Call) I regretted the course he was taking.

" The plaintiff here gave in evidence copies of the return of attachments from the Register's office — which are made part of the case without copying.

" *Asa Hutchins* — Lived at Damariscotta bridge — was deputy sheriff on 6th March — Dr. Call came in and threw down a writ on my table and wanted me to minute an attachment on it as of the 5th. I don't know against whom it was. Objected to, and admitted by the Court. I declined doing it. He urged me and I made a minute on the writ. — But I was not qualified — told him so, but he said that would make no odds — and I did make a minute on the writ with a pencil. I went up same day and got qualified — can't say whether I did or did not renew the minute on same writ afterwards. Am not on good terms with defendant — have not been on friendly terms with him for a number of years.

" *Israel L. Kinney,* testified that he paid $400 to defendant, the amount of a note he gave defendant. Did not recollect whether the note was running to defendant or to W. P. Harrington. It was for 60 or 90 days. It was paid for W. P. Harrington.

Witness held a note against W. P. Harrington for about $318 and interest — sold it to defendant in 1841 — thinks he heard Harrington's failure the next morning after selling the note to defendant. He further testified that Harrington came to him and said if he could get $400 he could pay Call — and wanted to get witness to make a note of that amount. — He did so and soon after John Glidden came and gave witness his note for same amount. Did not know whether he gave his note to Harrington or to defendant — had no conversation with or in the presence of defendant respecting the object or purpose of that note. — What he understood about it, as testified in direct examination, was from Harrington. Did not hear any thing from defendant, as to how he came by the note, or what

Handly *v.* Call.

for. — When he sold the note he held against Harrington to defendant, he took defendant's note for it which was dated at the time he gave him H's note. — Don't know but defendant paid him part money. On being shown the note for $331,87, dated March 4, 1841, canceled — witness said that was the note, as he thought, defendant gave him, as above mentioned — that the note had been paid and taken up — did not recollect defendant's telling him at the time of his letting defendant have that note, that he had brought one suit against Harrington and should commence another on that very day, on the other notes — but thinks he did say to defendant, that he did'nt care how soon he sued it (the note he let him have). Sometime before, think I did hear Harrington say to defendant that he had used him better than any one else, in reference to the notes he held against him.

" *John Glidden* testified, that he gave J. L. Kinney a note for $400 — Myrick signed note with witness to Medomak bank — that witness raised the money to relieve the land from attachment — I wrote to Myrick to sign the note. The note to bank has been renewed. Handly has paid me the $400 I paid to Kinney on the note to him.

" *Cross examined.* — Do'nt recollect whether any one else signed note to Kinney with me. The note to the bank was signed by Harrington. It was a joint and several note. *Quest.* Was it not Harrington's note ? Think Myrick had the money raised on that note, but don't know — think plaintiff did not have the money. *Quest.* Was not Harrington the principal on said note to bank ? *Ans.* It was a joint and several note. *Quest.* Was it not for Harrington that you and Myrick signed the note to bank ? *Ans.* It was joint and several — don't know whether or not it was for Harrington. *Quest.* Was not Harrington's name first on the note ? *Ans.* Rather think it was — believe it was. *Quest.* Do you know of plaintiff paying any thing whatever to defendant ? *Ans.* I don't know that he did — otherwise than he has paid me the amount of the note I gave Kinney.

" Myrick, myself, Deac. Day and Handly signed a note as

sureties for Harrington to Thomas Burton for some $2000. — It was for Harrington's use — he had the money — he was principal in the note. The deed of the land to Handly was to secure the payment of that note — that was the understanding — to clear the attachments and take up all. — Handly had the land to secure the Burton note — Handly agrees to pay the Burton note as far as the estate thus conveyed by Harrington will go.— We, the sureties on that note, will have to contribute the residue. (Defendant's counsel here objects that the witness is clearly interested). And releases are thereupon made and exchanged between Handly and the witness. (Objection is still made to the witness as interested, but overruled by the court.) The witness is called again in the afternoon and asked by plaintiff's counsel, if he wished to alter any part of his testimony and replies that he does not.

" On the part of the defendant the following witnesses were called.

" *Ezra B. French.* — Home at Dam'a Bridge — temporary residence now at Augusta. — In 1841 was acquainted with Joel How, Jr. — He used to be every day in my office, was on friendly and confidential terms as lawyer and deputy sheriff. — Had several conversations with him in March, 1841, about the alleged ante-dating of writs, *Call* v. *Harrington,* in all which he gave the charge the most explicit denial. — He told me that Dr. Call said he wished to secure himself without injuring Harrington and wished him to say nothing of his having any writs. — And that was the reason he did'nt tell them any thing about them — he said he had the writs from Dr. Call before he went to Harrington's corner to serve Myrick's writ. As often as he, How, spoke with me about it, which was quite a number of times, he assured me there was no ante-dating — that the services were made when they were dated. He made those assurances in strong language. He told me that Dr. Call asked him, when he gave him the writs, if he had any thing against Harrington, and he told him he had not, for he had not. One day he came over to my office, from Hussey & Coffin's office, and appeared very much excited — said that they had

been accusing him of making false returns on Call's writs — expressed and appeared to feel great indignation at being so accused — and was always very indignant at such a charge being made.

" Sometime afterwards, and just before April Court, he came in one day and said he understood they had written to the high sheriff to get him removed — and wished me, when I went over to Court, to see the high sheriff and state the facts to him. — And he related them to me as he had before.

" Witness saw Harrington in the village early in the morning after the failure — lived 3 or 4 miles off.

" There has been a serious quarrel for some years between the defendant and his friends and John Glidden, Handly and their friends — growing out of the affairs of the old Damariscotta Bank, as he understood.

" *Wales Hubbard* — testified that on a former trial of this action, before the District Court last Feb. Term, he was employed by defendant to take down the testimony of the witnesses that he might preserve their testimony. — Was not counsel in the cause — did take down their testimony truly, and among others he took down in writing the testimony of Joel How, Jr. who was a witness in that trial — that he had been accustomed to take testimony as delivered, and thought he could take down testimony as delivered with much accuracy. That said How testified *as follows,* (which he is enabled to state from the minutes he had in his hand, taken down by him,) viz : —

" In March, 1841, I was deputy sheriff. — 5th March (I suppose.) — Can't tell whether 4th or 5th. — No means of telling which — it was the day I went to Harrington's corner. — I have no doubt it was the 5th. — Dr. Call asked me to sign a return on a writ. — It was the first writ I had served. — I signed the return. — Something like six hours after, Hussey called for me to go to Harrington's corner. I next saw the writ the next day after I went to Harrington's corner. — I had the writ one or two hours in my possession ; Call then took it. I saw the writ again on the next day — there was more writing in the writ than before. — I told him (Call) it looked too bad to go

into court. — I did object to it — and he took it. I did see it again within the 4 days; *then* he shew me two writs— it was at Call's office. I did make the return on the two writs. — Call gave as a reason he could not *get the declaration in one* — said there was no difference whether I made return on two or one — the old one destroyed by Call — at the time the two writs were shown to me Call told me I could transfer from one to the other. I have an impression from the conversation that he got some of the notes after the writs were made — can't state the conversation word for word. — Call said sometime after, he got the notes and interlined.— Said they could'nt hurt me for it — it was within the 4 days, he told me so. — I told him I was afraid to do it — he said I had a right to transfer the first on to the two writs.

" I gave the two writs to Dr. Call. I made the return and sent them to Wiscasset to register. — Can't say whether I made any other attachments that month, *Call* v. *Harrington,* — ** — the sum sued for; date of writ, &c. in the return, same as the writs — (Witness asked if he had conversation with Call about it afterwards,) yes ; after the return — the time of the barratry case, I told him, if they asked me such and such questions I should have to answer them. He said I had no right to, and he should stop me.

" One time after, about Dec. Mr. Green wrote me considerable sharp letter to clear up the charges against me — Call said that Burgess would be Sheriff and there should be no other Deputy but me at the Mills, or at the Bridge — this was Dec. or January, or abouts. I told him what I had done, it would be a hard thing for me to get clear of the charges. ———— *Cross examined* ———— *** (what charges ?) I think it likely I was speaking of the writs, (but don't you know ?) to the best of my knowledge, I was.

" It was on the 5th — it might have been the 4th — I made return on the first writ. I did sign the return — did 'nt see the inside till afterwards; it was returnable next Court; I did read the declaration — if I had 'nt read the writ, how could I have made the return ? Did 'nt see the inside ————, but on the

6th had first writ in my possession some hours — can't recollect all the notes — John M'Dugal note I do recollect. The two writs I made return on — at the time did 'nt read them but did afterwards within the four days — don't know that I have seen them since, only the copies — Col. Hussey had the copies, (when?) don't know — within, say, six months from now ($\frac{1}{2}$ 6 months?) it strikes me about three weeks ago, (how do you know they were copies?) they look like the returns I made — did read the copies of the writs — part of them — read the returns. The returns went the first mail after I made them — they were delayed at Damariscotta mills. I caused the returns to be made by my father. — I employed my father to write them for me — did make the returns on the two writs within the four days.

" What sort of return did you make? Real estate, I think, — am not willing to say on oath I returned real estate. After the 4 days did you make any other return on the two writs? I did not. Did not make any other return on the two writs then — wrote them myself — Dr. Call did not make the return for me on the two writs.

" 1st writ, attachment of real estate,— did, I think — not sure, read the writ. What did you do with writ? Don't know — don't know that I shew it to any one. Don't know what the Dr. took it back for — don't recollect whether or not any thing was said, what taken back for — gave it back to him about his office — can't say whether he called for it or I gave it to him — don't recollect any thing that was said at the time — after register of attachments gave the two writs to Dr. Call — don't know but that I took them to Topsham for him — can't say whether I did or did not see them after I gave them to Dr. Call — might, might not.

" Dr. Call did not tell me he had put any more notes in the writs. Didn't say he had not put more in. Did take the oath of office as deputy sheriff [asked as to false return, &c. and Court interfered to protect, and told witness he was not obliged to criminate himself, but he would be allowed to state voluntarily. — Ruggles, I won't insist.]

" (Witness asked if there is any bond given by plaintiff or any

one to indemnify him ?)   I have got no bond of indemnity — don't know that I ever saw one.   Did you understand that a bond was made to protect you ?   Don't know — have no recollection of ever seeing one.   Thinks he has not been informed there was such a bond.   Has no recollection of saying any one was a damned fool for telling there was such a bond. — Thinks Capt. Handly would indemnify him — did marry plaintiff's niece — my business is now clerk in a store — my brother's clerk — have heard that Hanly Glidden gave notes for the goods — heard my brother say something about it. — When did you first acknowledge you made a false return ?   Within a year.   Since you married plaintiff's niece ?   Yes.   What inducement to disclose it ?   I thought it might as well be out as in.

" Never did before state it under oath — did furnish Hussey a written statement — about last July — never before told any one — I made the statement voluntarily — there was no particular inducement to tell the story held out to me — thought they would indemnify me — they *have* told me they would indemnify me.

" *Direct resumed.*—Witness is shown copy of record of returns from register — these are the copies I saw in Col. Hussey's office that I spoke of.

" *Thomas J. Merrill.* — Had a conversation with How about the charge of ante-dating said returns — he said the charge was utterly false — that the returns were right — said his uncle Harrington threatened him—did not know why his uncle should blame him for serving Call's writs — he might as well do it as any other deputy.

" *Edward Bartlett*, was riding from Damariscotta to Whitefield in company with How, who asked him if he had heard that he had not done his business right for Call, in the service of those writs — I told him I had. — He said it was not true — that the business was all done right.

" *Henry P. Cotton* — had talked with How about the returns of those writs, *Call v. Harrington* — he told me every thing was fair in regard to those attachments — said he was not obliged to tell them what business he did for other folks.

"*John R. Coffin* — testified that Asa Hutchins was in his office one day and Dr. Call came in and said something to him about what Hutchins had reported about his requesting to ante-date a writ.— *Quest.* Did or did not Dr. Call demand of him to know if he had circulated any such report? *Ans.* Don't recollect particularly what was said — some hard talk — have no doubt that Dr. Call in that conversation denied having asked Hutchins to ante-date any return — don't recollect Hutchins saying to him that he ever did — Hutchins equivocated.

"*Deacon Day* — testified that he signed a note to Thomas Burton for $2000, as surety for Harrington, with John Glidden, Myrick and Handly — also sureties — that 1st Oct. 1843, he was called upon by the other sureties to pay his quarter part of the note — that he did then pay his one fourth part — the parties to the note were present. — They said I must settle up my one fourth part — and another note was given for the balance due, which I signed with the other sureties, that note has not been paid to my knowledge.

"*Cross Examined.*— Previous to my paying part of the note, Burton wanted some money on the note and we gave him a note for $500 to get that amount from the Bank. — Burton had to pay or did pay that note to the Bank and that was brought into the settlement when I paid one fourth as above stated.

"*Joel How* — testified that he had been deputy sheriff for some 20 years — that he made the returns on the writs shown to him at the request of his son, Joel How, Jr.— a short time before the Court to which they were returnable — that the upper returns on each writ were in the handwriting of his son.— That he also made the return of the attachment at his request, to be filed in the register's office.— That at the great fire at Damariscotta Bridge — the building in which Dr. Call kept his office and papers, was burnt and many of its contents. Some of the Dr's papers were rescued.

"The writs above referred to in How's evidence, being writs *Call* v. *Harrington*, were produced in evidence and are made part of the case without copying.

"The jury on this evidence gave a verdict for plaintiff of $1061,84.

"Defendant's counsel excepts to the ruling of the Court admitting said John Glidden to testify, and prays this exception may be allowed and signed.

"John Ruggles, defendant's attorney."

"The foregoing is believed to be a true statement of the evidence as exhibited in the course of the trial of the above case.

"And the foregoing exception having been duly taken and reduced to writing and presented to me in open Court, and before the adjournment thereof without day, and being found according to the truth, is allowed.

"Ezekiel Whitman, the Justice presiding, &c."

Immediately after the return of the verdict, there was a motion made by the defendant to set it aside, because it was rendered against the evidence, against the weight of the evidence, and against law. Afterwards, there was another motion made to set aside the verdict on account of newly discovered evidence.

The facts, on the motion on account of newly discovered evidence, sufficiently appear in the opinion of the Court.

The whole case, on the exceptions and on the motions for a new trial, after May Term, 1847, was fully and ably argued in writing by

*Ruggles,* for the defendant; — and by

*Wells* and *Groton,* for the plaintiff.

The arguments, however, are too extended for publication.

The opinion of the Court, after a continuance for advisement, was drawn up by

Whitman C. J. — The exception to the admission of the witness, Glidden, is not sustainable. This is a special action on the case for a conspiracy, between the defendant, and one Joel How, jr. to defraud the plaintiff. Nothing more is recoverable than the amount of the injury, which the plaintiff personally and individually has sustained. No one, unless by special agreement, could have a right to share with him in any

portion of the damages he may recover.  If the suit were for a trespass done to a chattel owned  by the plaintiff and another, jointly, he could recover only for the amount of his own individual injury.  Of course the other,  no more than any one else, could have, without a special agreement for the purpose, any interest in what he might recover.  It is not even suggested that Glidden had made any such agreement with the plaintiff.  He therefore, could have  had no interest in the event of this suit, and the exceptions must be overruled.

But the defendant has filed a  motion for a new trial, alleging that the verdict, which was for the plaintiff, was returned against evidence, the weight of evidence and against law. The motion is at common law, and is grantable in some measure at discretion.  3 Blac. Com. 390.  When the justice presiding at the trial, or the Court, upon an examination of the case, is satisfied that injustice has not been done by the verdict, a new trial should not, ordinarily, be granted.  *Boyden* v. *Morse,* 5 Mass. R. 365 ; *Train* v. *Collins,* 2 Pick. 145 ; *Roberts* v. *Curr,* 1 Taunt. 495 ; *Pluncket* v. *Kingsland,* Bro. P. C. 404 ; *Falconburg* v. *Pearce,* Amb. 210.

The verdict in this case cannot be said to have been rendered wholly against evidence ; for a witness, Joel How, jr. produced by the plaintiff, the co-conspiritor named in his writ, testified to all the  material facts requisite to sustain the action. If the witness were perfectly credible, and there were no evidence inconsistent with that given by  him, the verdict should not be disturbed.  And so, if the witness were impeached, and yet was  corroborated by other evidence, so that the jury should  not have  hesitated  to believe  the existence of the facts as detailed  by him, no  new  trial should be granted.

But it is contended  that the  witness has placed himself in an attitude, that should have  rendered his  testimony of very little weight, and that it is  without corroboration.  It appears that he was the one  accused by the plaintiff in  his  writ and declaration, as a co-conspirator with the defendant in the perpetration of the fraud.  He was, moreover, a deputy sheriff, under oath  to act faithfully as such ; yet he now testifies, that he lent

himself to the defendant to aid him in a most nefarious attempt; and actually made two false returns of attachments, as having been made several days before they were in fact made. These returns were made as long ago as March, 1841; and, that they were false, was kept a secret by him till the fall of 1845. And it appears that, in the mean time, he had made the most emphatic declarations that the returns were true on several occasions. And at the trial of this cause in the District Court, according to the testimony of Wales Hubbard, he gave as a reason for now coming forward with the disclosure of his malconduct simply that it was because he thought " it might as well be out as in". At the former trial Mr. Hubbard also states, that he swore that this was the first business he ever did as a deputy sheriff; and that it was on the sixth of March; that about six hours afterwards Hussey handed him writs against the same debtor, against whom the defendant's writs were issued, of which he made service between sundown and twelve o'clock at night of that day; and the returns were made as of the fifth of March. At the trial in this Court he testified, that the first writ was handed him by the defendant on the sixth of March, on which he made a return as of the fourth of that month; and that it was destroyed, and two new ones made and handed to him by the defendant on the seventh, on which he returned attachments as having been made on the third and fourth of that month. There are some other discrepancies between his statements on the former trial, as stated by Mr. Hubbard, and the one in this Court. And there are some particulars in which his testimony here can scarcely be reconciled, the one part with the other. Before he made the disclosures of his turpitude it appears he had married a neice of the plaintiff's. Under these circumstances it is insisted, that the testimony of this witness should not have been credited. But his credibility was matter for the jury; and they would seem to have believed him. We might not, and it is not improbable that we should not have been satisfied to find the facts relied upon to be sufficiently established by such a witness, if uncorroborated by other evidence.

Handly *v.* Call.

But it is contended for the plaintiff, that the testimony of the witness was corroborated, first, by the testimony of Israel L. Kinney. He testified, that he sold the defendant one of the notes described in the defendant's writ, served by How, and that he thought he must have sold it on the fifth of March, which would be a day after the attachment, as returned by How; and this, it was supposed would show that the attachment was ante-dated, as testified by How. But Kinney testified that the defendant gave him a note for the amount on the same day he sold the note to him; and on being by the defendant shown a note canceled, he said he believed that was the one the defendant gave him in exchange; and that appeared to have borne date the fourth, and of course rendered it presumable that he must have been mistaken, as to his having sold his note to defendant on any other day; and hence his testimony failed to corroborate that of How.

The next piece of evidence relied upon in corroboration of that given by How was obtained from Asa Hutchins, which, though objected to by the defendant, was admitted. It was, that the defendant, on the sixth of the same March, procured him to note an attachment on a writ as of the fifth of that month, though he, the witness, was not then qualified as a deputy sheriff; but was then about being qualified; that the defendant said to him, that it would make no difference. Whether he afterwards extended, and perfected his return, he could not remember. He did not recollect in whose favor or against whom the writ was. Of course could not say it was one of those served by How. This testimony, if properly admissible, may have been viewed by the jury as tending to fortify the presumption that How testified correctly. If such can be believed to have been its effect, and if it was improp-erly admitted, the admission of it may form a good cause for granting a new trial; for the verdict would be rendered without being warranted by law. It is true, however, that the admis-sion of illegal evidence does not, in every case, entitle a party against whom it is admitted, and against whom the verdict may be rendered, to a new trial. *Malin* v. *Rose*, 12 Wend.

258 ; *Crary* v. *Sprague, ib.* 41 ; *Kelly* v. *Merrill,* 14 Maine R. 228 ; *Polleys* v. *Ocean Ins. Co. ibid.* 141. But if it be reasonable to believe, that the jury could have been unduly influenced by the wrongfully admitted testimony, or if it be doubtful whether they would otherwise have decided as they may have done, a new trial should be granted. *Ellis* v. *Short,* 21 Pick. 142 ; *Wilkins* v. *Paine,* 4 D. & E. 468. In the case at bar we can by no means be sure, that the jury were not influenced by the supposed illegal testimony, and if it should not have been admitted, we should be bound to grant a new trial.

We must then proceed to consider whether it was legally admissible. There are instances in which it has been found necessary to admit the proof of acts, similar to those directly in question ; but it is apprehended, that this has been done only where it might become indispensable to do so, in order to show a guilty knowledge or intention ; as in the case of an indictment for passing counterfeit money or bank bills. An attempt to pass the same, or similar ones, in other instances, under suspicious circumstances, has been often admitted in order to show that the culprit must have known of the spuriousness of those for the passing of which he stood indicted. And the same has been done in cases of goods obtained with an intention to defraud the vendor, by way of showing the intention of the vendee in making the purchase. In the case at bar there was no need of proof to show, that one procuring an officer to make a false return, must have had a guilty knowledge, and a criminal intent. The cases are few, and arising out of the peculiar necessity of the case, in which it can be allowable to show, that a person accused of committing an offence, has committed other offences of a similar kind, in order to his conviction of the offence charged. And on the whole, it must be admitted, that the case before us is not of a description allowing of such proof.

The propriety of granting new trials is very aptly elucidated in Black. Com. p. 390, where it is said, that, " in the hurry of a trial, the ablest judge may mistake the law, and misdirect

the jury. He may not be able so to state and range the evidence as to lay it clearly before them ; nor to take off the impression, which may have been made on their minds by learned and experienced advocates." And " under these circumstances the most intelligent and best intentioned men may bring in a verdict which they themselves, upon cool deliberation, would wish to reverse."

A motion has been also made in this case for a new trial, on account of newly discovered evidence ; and the proof taken to support it has been very voluminous ; but much of it, and indeed a very large proportion of it, is without use. The indictment of the defendant for the same cause, relied upon by the plaintiff, and the acquittal of the defendant thereof, is wholly inadmissible ; as nothing of the kind, unless by the consent of the plaintiff, could be used in evidence in the trial of this action. And the additional statements of the witness, How, proved to have been made on occasions, other than those proved at the trial, are but cumulative evidence, which is never considered as authorizing the granting of new trials.

But the evidence does present one ground, if there were no other, upon which it would be clearly reasonable, that we should suffer the cause again to be laid before a jury. It must now be taken to be a fact, susceptible of proof, that the plaintiff, before the commencement of this suit, became bound to indemnify his witness, Joel How, Jr., against harm for testifying to the facts of the alleged conspiracy, in which he himself was the principal actor. But for this, it is reasonable to believe that no such testimony could have been obtained from him. There is nothing in the case that should be deemed indicative, that the disclosure by the witness, originated from any qualms of conscience on his part. On the contrary, when inquired of why he made the disclosure he replied, merely, that he thought it might as well be out as in. In such case the jury would have a right to infer, that the witness had been operated upon by considerations, other than those connected with a simple regard for the truth. And such a presumption might gain strength, and become fortified by other circumstances and considerations.

It cannot be predicated of the witness, that he was under any very powerful moral restraint. It may well be feared that an inconsiderable temptation would induce him to accommodate himself to the wishes and designs of any one, having a nefarious purpose to accomplish. It seems to be made manifest by the testimony of Hussey and Hilton, that the plaintiff has been, in no inconsiderable degree, hostile to the defendant. The witness, before he made his disclosure against the defendant, had married the plaintiff's niece; and had become connected in a store which afforded him his means of support, he himself being destitute of property; and the plaintiff had lent his aid in upholding the business in the store, by becoming surety for the stock employed in it. All these considerations could, and perhaps well might, raise doubts in the minds of jurors whether the inducement to the giving of the bond was strictly in accordance with a design merely to elicit nothing but the truth. The defendant at the former trials appears to have attempted, without success, to prove the existence of such a bond. It may now, therefore, be regarded as newly discovered evidence; and taken in connection with all the other evidence, showing the conduct and pliability of the disposition of the witness, and the temptation he may have been under to accommodate the plaintiff, and the hostility of the latter to the defendant, we cannot doubt, that the existence of such a bond might well have a very material effect upon the minds of jurors in deciding the case, depending almost, if not quite wholly, on the testimony of this witness for its decision in favor of the plaintiff.

*New trial granted.*